# IMPORTANT NOTICE
## NOT TO BE PUBLISHED OPINION

THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED." PURSUANT TO THE RULES OF CIVIL PROCEDURE PROMULGATED BY THE SUPREME COURT, RAP 40(D),  THIS OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE CITED OR USED AS BINDING PRECEDENT IN ANY OTHER CASE IN ANY COURT OF THIS STATE; HOWEVER, UNPUBLISHED KENTUCKY APPELLATE DECISIONS, RENDERED AFTER JANUARY 1, 2003, MAY BE CITED FOR CONSIDERATION BY THE COURT IF THERE IS NO PUBLISHED OPINION THAT WOULD ADEQUATELY ADDRESS THE ISSUE BEFORE THE COURT.  OPINIONS CITED FOR CONSIDERATION BY THE COURT SHALL BE SET OUT AS AN UNPUBLISHED DECISION IN THE FILED DOCUMENT AND A COPY OF THE ENTIRE DECISION SHALL BE TENDERED ALONG WITH THE DOCUMENT TO THE COURT AND ALL PARTIES TO THE  ACTION.

RENDERED: MARCH 23, 2023
NOT TO BE PUBLISHED

# Supreme Court of Kentucky

2021-SC-0584-MR

ROY SHERMAN BUNCH                                     APPELLANT

V.                 ON APPEAL FROM WASHINGTON CIRCUIT COURT
HONORABLE KAELIN G. REED, JUDGE
NO. 19-CR-00105

COMMONWEALTH OF KENTUCKY                     APPELLEE

**MEMORANDUM OPINION OF THE COURT**

**<u>AFFIRMING</u>**

On October 24, 2019, Appellant Sherman Bunch fired gunshots at his former girlfriend Julee Gribbins[1] and his cousin Tim Marple as they fled into Marple's home. Marple's eight-year-old daughter Veda was in the home at the time. Bunch also fired shots into Gribbins' unoccupied vehicle parked near the home. None of Bunch's shots struck Marple, Gribbins, or Veda.

A jury in Washington Circuit Court convicted Bunch of two counts of attempted murder, one count of wanton endangerment in the first degree, and two counts of first-degree criminal mischief. The jury recommended a total sentence of thirty-five years and the trial court sentenced in conformity with

---

[1] The Commonwealth identifies Julee's surname as "Gribbons." However, the record below and Bunch refer to her as "Gribbins" and we therefore adopt that spelling herein.

that recommendation. Bunch now appeals to this Court as a matter of right. KY. CONST. § 110(2)(b). Following a careful review, we affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Julee Gribbins and Sherman Bunch were in a romantic relationship beginning in 2014. The relationship was tumultuous and involved numerous incidents of domestic violence. Gribbins moved out of Bunch's home in July 2019 and ended her relationship with him by October 2019.

On the night of October 24, 2019, Gribbins visited the home of Bunch's cousin and neighbor Tim Marple. During the visit Gribbins, Marple, and Veda went onto the porch and saw a car driving down the road. Gribbins told Marple it was Bunch's vehicle. Veda went back inside, followed later by Gribbins and Marple. Gribbins then went back outside to start her car before returning to the home to use the restroom. Gribbins was scared and Marple therefore accompanied her as she prepared to walk back to her car.

While heading back to her car with Marple, Gribbins opened Marple's basement storm door and saw Bunch standing about twenty feet away. Gribbins screamed "run" and began to run back through the house with Marple. As they ran Bunch fired shots through the basement doorway and through a window above the basement door. One shot passed between Gribbins and Marple. Bunch also fired shots into Gribbins' vehicle.

Gribbins and Marple barricaded themselves in an upstairs bedroom and were eventually able to get Marple's eight-year-old daughter Veda, who had been in an upstairs bathroom when Bunch began shooting. None were hit by

2

the gunfire, though Gribbins was struck by exploding glass during the shooting. In fact, she told a 911 operator she may have been struck by a bullet in the back.

There was no evidence at trial that Bunch ever entered the house. Police eventually located him after the shooting and took him to the hospital for a possible overdose of nitroglycerin. While at the hospital Bunch gave a voluntary statement to Deputy Ryan White in which he stated, among other things, that he only intended to scare rather than kill Gribbins and Marple, that he did not know Veda was in the home at the time of the shooting, and that he would have waited until a different time if he had known Veda was there.

A grand jury indicted Bunch on three counts of attempted murder, one count of tampering with physical evidence, and two counts of first-degree criminal mischief. Bunch's defense at trial was that he fired the shots with the intent only to scare rather than kill Gribbins and Marple, and that he did so under extreme emotional disturbance ("EED") due to their tormenting of him. The trial court instructed the jury on EED and gave attempted first-degree manslaughter and first-degree wanton endangerment instructions as lesser-included offenses of the attempted murder charges. The trial court refused Bunch's request for lesser-included offense instructions as to second-degree wanton endangerment or attempted first-degree assault under EED.

The jury convicted Bunch on one count of attempted murder as to Gribbins, one count of attempted murder as to Marple, one count of first-

3

degree wanton endangerment as to Veda, and two counts of first-degree criminal mischief. The jury recommended a sentence of fifteen years on each of the attempted murder convictions and five years on the wanton endangerment conviction to run consecutively, along with concurrent one-year sentences on the criminal mischief convictions, for a total sentence of thirty-five years. The trial court sentenced Bunch in accordance with this recommendation.

## ANALYSIS

Bunch raises three issues for our review: (1) whether he was substantially prejudiced by the trial court's admission of the investigating deputy's testimony regarding his reasons for charging Bunch with attempted murder; (2) whether he was substantially prejudiced by the trial court's admission of evidence of prior domestic violence and related convictions; and (3) whether the trial court erred in refusing to instruct as to second-degree wanton endangerment and attempted first-degree assault under extreme emotional disturbance. We review each issue in turn, providing additional facts as necessary.

### I. The trial court did not err in admitting the investigating deputy's testimony regarding his reasons for charging Bunch with attempted murder.

Bunch argues the trial court erred in allowing Deputy White, the investigating sheriff's deputy, to testify as to the reasons for his decision to charge Bunch with attempted murder. We generally review an allegation of nonconstitutional evidentiary error for abuse of discretion. *Mason v. Commonwealth*, 559 S.W.3d 337, 339 (Ky. 2018). That is, we ask whether the

4

trial court's ruling was "'arbitrary, unreasonable, unfair, or unsupported by sound legal principles.'" *Id.* (quoting *Lopez v. Commonwealth*, 459 S.W.3d 867, 872-73 (Ky. 2015)). A nonconstitutional evidentiary error "'may be deemed harmless if the reviewing court can say with fair assurance that the judgment was not substantially swayed by the error.'" *Id.* at 339-40 (quoting *Murray v. Commonwealth*, 399 S.W.3d 398, 404 (Ky. 2013)).

At trial, the Commonwealth played a recording of Bunch's voluntary interview with Deputy White in the hospital shortly after the shooting. Bunch's counsel then cross-examined Deputy White, eliciting the deputy's acknowledgement that Bunch repeatedly said during that interview he intended only to scare Gribbins and Marple, despite not then knowing he would be charged with attempted murder. On re-direct examination the Commonwealth then asked Deputy White what factors caused him to charge Bunch with attempted murder.

The defense objected and a bench conference was held. The Commonwealth argued that in cross-examining Deputy White, Bunch's counsel challenged the propriety of his decision to charge attempted murder and thus opened the door to Deputy White's explanation of his basis for those charges. The trial court agreed with the Commonwealth and overruled the defense objection. Deputy White then offered the following testimony regarding the factors that led him to charge Bunch with attempted murder:

> So based upon the evidence that was on the scene at [the location of the shooting], as well as evidence that was recovered [at the location where Bunch was found], being the mask, the gloves, the flashlight, binoculars, the bullet casings, where they was [sic] in

5

the doorway as to where he was. The fact that the bullets, generally most wanton endangerment cases are, you know, someone shooting into the ground, into the air, it's generally not directly at where the victims were standing. Due to the fact that they were standing in that threshold of that doorway and bullets came through the threshold of that doorway, as well as the mask and gloves, and the jacket you know which showed premeditation. You know and the fact that he said, "If I knew Veda was there I would've did it a different night," you know. Due to those things that's why I decided to go with criminal intent to commit murder.

## A. Deputy White did not state conclusions of law or opine as to the ultimate issue of guilt.

Bunch first contends Deputy White's testimony regarding his reasons for charging Bunch with attempted murder was an impermissible conclusion of law and opinion that Bunch was guilty of attempted murder rather than wanton endangerment. Before proceeding to the merits, however, we first note we have no occasion here to consider whether Bunch "opened the door" to Deputy White's testimony. Also known as the doctrine of curative admissibility, "'opening the door' . . . is a form of waiver that happens when one party's use of *inadmissible* evidence justifies the opposing party's rebuttal of that evidence with equally *inadmissible* proof.'" *Id.* at 343-44 (quoting *Commonwealth v. Stone,* 291 S.W.3d 696, 701-02 (Ky. 2009)) (emphasis added). Here, Deputy White's testimony arose because the Commonwealth played Bunch's recorded interview for the jury. That recorded interview was not inadmissible evidence.[2] On cross-examination, Bunch then elicited Deputy White's acknowledgement that Bunch stated during the interview he only

---

[2] Bunch's statement to Deputy White was not inadmissible hearsay given Bunch's status as a party-opponent to the Commonwealth. KRE 801A(b)(1).

6

intended to scare Gribbins and Marple, and that he did not know at the time of that statement that he would be charged with attempted murder. This too was not inadmissible. The Commonwealth then asked Deputy White to explain the basis for charging attempted murder. Thus, because Deputy White's testimony explaining the basis for his attempted murder charges was not precipitated by inadmissible testimony, we need not consider whether Bunch "opened the door" to Deputy White's explanation.

As to the merits of Bunch's contention that the trial court erred in admitting Deputy White's testimony, it is well-recognized that "a witness generally cannot testify to conclusions of law." *Tamme v. Commonwealth*, 973 S.W.2d 13, 32 (Ky. 1998). The admission of a witness's opinion as to the defendant's guilt or innocence is likewise improper. *Nugent v. Commonwealth*, 639 S.W.2d 761, 764 (Ky. 1982) ("The issue of guilt or innocence is one for the jury to determine, and an opinion of a witness which intrudes on this function is not admissible . . . .").

Here, however, Deputy White offered no conclusion of law or opinion as to Bunch's guilt or innocence. Rather, he testified to the facts he believed warranted a charge of attempted murder. Those facts included his location of items suggesting premeditation in Bunch's car, Bunch's firing of bullets through the doorway where the victims had been standing and the casings found nearby, the fact Bunch fired the bullets directly at the victims rather than at the air or ground, Bunch's statement he would have waited if he had known Veda was home, and Bunch's history of domestic violence against

7

Gribbins. At no point did Deputy White either state or imply that the proper conclusion from these facts was that Bunch was guilty of attempted murder. Nor did Deputy White opine that he believed Bunch was guilty. His testimony therefore did not violate the prohibitions against a witness offering conclusions of law or opinions as to guilt or innocence.

**B. Deputy White did not misstate the law regarding wanton endangerment.**

Bunch also argues Deputy White misstated the law in testifying that "generally most wanton endangerment cases are, you know, someone shooting into the ground, into the air, it's generally not directly at where the victims were standing." The Commonwealth first responds that although Bunch objected generally to Deputy White explaining the reasons for charging attempted murder, this issue is not preserved because Bunch did not thereafter specifically object to Deputy White's statement regarding wanton endangerment. When the Commonwealth asked Deputy White to give his reasons for charging attempted murder, Bunch objected before Deputy White could answer and a bench conference was held. At the bench conference Bunch asserted the question was improper because the trial was not a probable cause hearing, the jury was tasked with determining Bunch's intent rather than the basis for his charges, and the question essentially allowed the Commonwealth to make a closing argument. Bunch thus offered specific objections to the question before it was answered, and he was not required to later rearticulate his objections to specific testimony made in response to that question to preserve the error. *See Louisville & N.R. Co. v. Rowland's Adm'r,*

8

215 Ky. 663, 286 S.W. 929, 930 (1926) ("The law does not require idle formalities, and, the court having ruled the evidence admissible, and proper exceptions having been reserved, further objection to the same line of interrogation is not required."). We thus conclude Bunch's original objection was sufficient to preserve this issue.

Bunch contends Deputy White misstated the law regarding wanton endangerment because shooting into an occupied building is a classic example of wanton endangerment. Unquestionably there are circumstances where shooting into an occupied building constitutes wanton endangerment. *See* KRS[3] 508.060, Commentary (1974) (explaining that shooting into an occupied building with neither the intent nor effect of causing death or injury may constitute wanton endangerment). We have even previously recognized that the firing of weapons into occupied buildings is a "prototype" example of first-degree wanton endangerment. *Swan v. Commonwealth*, 384 S.W.3d 77, 102 (Ky. 2012).

Deputy White's testimony cast no doubt on that assertion. Indeed, Deputy White made no reference whatsoever to occupied buildings in discussing wanton endangerment. Rather, he testified that wanton endangerment generally does not involve firing directly at victims. Deputy White did not testify that firing into an occupied building cannot constitute wanton endangerment. Nor did he testify that firing into the air or the ground are the only times in which a finding of wanton endangerment would be

---

[3] Kentucky Revised Statutes.

appropriate. Rather, he simply stated that "generally most" wanton endangerment cases do not involve shooting directly at the victims but rather involve shooting into the air or the ground. While there are certainly many circumstances other than shooting into the air or ground that may constitute wanton endangerment, we do not find that Deputy White's testimony rose to the level of a misstatement or mischaracterization of the law.

We further note that even if Deputy White's testimony had been a misstatement of the law, any such error would have been harmless. The jury instructions properly set forth the required elements under KRS 508.060 for a finding that Bunch was guilty of first-degree wanton endangerment. In considering an appeal, we "presume that the jury followed the instructions before it." *Jewish Hosp. & St. Mary's Healthcare, Inc. v. House*, 563 S.W.3d 626, 636-37 (Ky. 2018). We have no reason here to question that presumption. Thus, because we presume the jury followed the trial court's correct instruction regarding the elements of first-degree wanton endangerment, there is no basis to conclude Deputy White's testimony had a substantial influence on the jury's findings and any alleged error in his brief reference to wanton endangerment would have been harmless. *See Mason*, 559 S.W.3d at 339-40.

### C. Deputy White did not opine as to the nature of Bunch's crimes.

Bunch further argues Deputy White's testimony regarding his reasons for charging attempted murder also impermissibly created an impression of expert law enforcement opinion that a verdict on a lesser-included offense of wanton endangerment was not warranted. Bunch contends the admission of this

10

testimony was thus contrary to our holding in *Ordway v. Commonwealth,* 391 S.W.3d 762 (Ky. 2013). We conclude that *Ordway* is clearly distinguishable from the facts here.

In *Ordway,* the defendant Ordway was riding in a car with the two victims. 391 S.W.3d at 772. A scuffle erupted and Ordway shot them. *Id.* The car then crashed and Ordway exited. *Id.* Witnesses testified that Ordway then returned to the car and again fired at the victims multiple times. *Id.* Witnesses testified Ordway also unsuccessfully tried to commandeer the vehicles of passing motorists at gunpoint. *Id.* at 772-73. While in jail, Ordway spontaneously told an investigating detective prior to the initiation of any custodial interrogation that he had "'nothing for [him].'" *Id.* at 773.

Ordway was charged with two counts of intentional murder. *Id.* at 771. At trial he claimed self-defense. *Id.* at 772. The investigating detective testified over Ordway's objection that people who legitimately exercise self-defense typically do not leave the scene of the crime, but rather put their weapon down, call 911 or otherwise request assistance, and cooperate fully with police. *Id.* at 775. He further testified "'[t]hey certainly don't leave the scene'" and they "'don't try to commandeer vehicles with force with a gun in their hand.'" *Id.*

We noted that the detective in *Ordway* thus "opined that [Ordway] did not act like those who had lawfully protected themselves but, had instead acted like those who were fabricating a self-protection defense." *Id.* We further noted this "opinion of an experienced and respected police detective that [Ordway's] conduct did not match the stereo-typical conduct of an innocent person acting

11

in self-defense authoritatively portrayed [Ordway's] defense as a fabrication." *Id.* at 777. We therefore reversed for a new trial given the error was not harmless but rather "clearly devastating to [Ordway's] claim of self-defense." *Id.*

The facts before us here are starkly different. Deputy White simply testified that generally, most wanton endangerment cases do not involve shooting directly at a victim. He did not offer a broad-sweeping assessment of the elements of wanton endangerment and then testify that Bunch's conduct did not fit within those elements. He did not testify that the facts did not fit the profile of a typical wanton endangerment crime. Nor did he otherwise opine as to the nature of Bunch's crimes. His brief statement simply did not rise to the level of an express or implied opinion that Bunch's conduct could not constitute wanton endangerment. We therefore find no error in the admission of Deputy White's testimony.

## II. The trial court did not err in admitting evidence regarding prior domestic violence incidents.

Bunch next argues the trial court erred in admitting prior bad acts evidence of previous domestic violence perpetrated by Bunch against Gribbins. That evidence included Gribbins' testimony that Bunch physically assaulted her during a Fourth of July Party in 2018 and that in August 2018 he forcefully pushed her into a jacuzzi causing her to badly bite her tongue. Gribbins further testified to a January 2019 incident in which Bunch verbally and physically attacked her for wearing a knee-length nightgown during a brief visit by Marple.

12

Gribbins recorded the January 2019 incident on her phone and the prosecution played that audio recording for the jury. Gribbins testified that though the recording was muffled, Bunch stated at one point during the incident that he would "blow [her] f'ing brains out." The day after this incident, Gribbins recorded a phone call with Bunch in which she informed him she was leaving. Bunch told Gribbins during the call "you bring the fucking law and I will put a bullet through your goddamn head personally." The prosecution played this recording for the jury as well.

The trial court admitted evidence regarding these July and August 2018 and January 2019 incidents under KRE[4] 404(b) for the purpose of proving intent and motive. The trial court also read a statement informing the jury that Bunch was convicted of one count of first-degree wanton endangerment, three counts of terroristic threatening, and four counts of fourth-degree assault as a result of the incidents. The prosecution elicited testimony that Bunch had pled guilty to those charges.

Gribbins also testified to other domestic violence beyond the scope of the trial court's KRE 404(b) ruling, including an incident in which Bunch became extremely angry after she overfilled a cat food bowl, his efforts to isolate her by giving her van to his parents, and his accusations that Gribbins was having sex with numerous other men including her brothers. Gribbins also testified she continued to have sex with Bunch even after ending her relationship with him because she knew based on his explosive behavior she

[4] Kentucky Rule of Evidence.

13

would get hurt if she did not.  She also told the jury she ultimately blocked Bunch on all platforms because he was harassing and stalking her.  She further testified she also made efforts to keep her location secret from Bunch because she knew he would hurt her children and her family.

Bunch moved for a mistrial because Gribbins' testimony as to these additional incidents went beyond the trial court's ruling that the July and August 2018 and January 2019 incidents were admissible under KRE 404(b). The trial court agreed the evidence should have come in but denied the motion. Bunch did not seek an admonition to the jury to disregard the evidence regarding these additional incidents.

### A. Bunch's allegation of error is preserved.

Before proceeding to the merits we must again address the Commonwealth's contention that Bunch has failed to preserve an alleged error, this time as to admission of the July and August 2018 and January 2019 incidents.  Before trial, the Court heard argument via Zoom regarding the Commonwealth's intention to introduce that evidence pursuant to KRE 404(b). However the trial court did not record the hearing.  Nor did Bunch prepare a narrative summary of the hearing for use in this appeal as permitted by Civil Rule ("CR") 75.13[5].  The Commonwealth now contends Bunch therefore has not

---

[5] CR 75.13 applied at the time Bunch could have prepared a narrative summary for use in this appeal.  That Rule was superseded by Rule of Appellate Procedure ("RAP") 25 on January 1, 2023.  RAP 25 now sets forth the procedure for inclusion of a narrative statement in the record on appeal as a supplement to or in lieu of an unavailable or insufficient official record of trial court proceedings.  Pursuant to our Order In re: Applicability of the New Rules of Appellate Procedure (Dec. 29, 2022), all

14

preserved his objection because the record contains neither a recording of the pre-trial Zoom hearing nor a narrative summary of that hearing.

We will find an objection as to the admission or exclusion of evidence preserved only if "a timely objection or motion to strike appears of record, stating the specific ground of objection, if the specific ground was not apparent from the context." KRE 103(a)(1). Here, the trial court noted on the record at trial that Bunch's objection to the admission of the KRE 404(b) evidence was preserved. While the argument of Bunch's counsel as to the specific grounds for their objection does not appear in the record, the trial court noted the morning of trial that they argued at the Zoom hearing the evidence was too temporally remote to be admitted under KRE 404(b). Thus, because the record indicates both Bunch's objection to admission of the KRE 404(b) evidence and the specific grounds for that objection, we conclude that this issue is preserved.

We briefly pause to note however that Bunch was not without recourse for the trial court's failure to record the Zoom hearing. Both our Civil Rules then in effect and our new Rules of Appellate Procedure afford litigants the ability to prepare a narrative summary to cure a deficiency or omission from the record. CR 75.13; RAP 25. Curiously, Bunch's counsel did not avail themselves of this remedy. Though we were nonetheless able to find the statement and nature of Bunch's objection in the record, preparation of a

matters pending on or filed after January 1, 2023 are governed under the new Rules of Appellate Procedure.

15

narrative statement is the strongly preferred procedure to cure deficiencies, insufficiencies, or omissions from the record. This is particularly so given that in considering an appeal, we are under no obligation to search the record for a party's preservation of error. *See Phelps v. Louisville Water Co.,* 103 S.W.3d 46, 53 (Ky. 2003).

## B. The July and August 2018 and January 2019 domestic violence incidents, recordings, and convictions were admissible under KRE 404(b) to show intent.

Having determined the issue is preserved, we now consider the merits of Bunch's argument. Bunch contends the trial court erred in admitting evidence of the July and August 2018 and January 2019 incidents and Bunch's resulting convictions. Bunch asserts the prejudicial effect of that evidence substantially outweighed its probative value given the temporal separation of nine to fifteen months between those incidents and the crime at issue here. Bunch maintains the trial court also admitted too much evidence regarding these incidents, and in particular should have excluded the two recorded phone calls because they were inflammatory and difficult to hear.

KRE 404(b) governs the admissibility of evidence of other crimes, wrongs, or acts. It provides that such evidence is "not admissible to prove the character of a person in order to show action in conformity therewith." However, the Rule also provides two circumstances in which evidence of other crimes, wrongs, or acts may be admissible. First, such evidence may be admissible if "offered for some other purpose, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of

16

mistake or accident." KRE 404(b)(1). Second, such evidence may also be admissible if it is "so inextricably intertwined with other evidence essential to the case that separation of the two (2) could not be accomplished without serious adverse effect on the offering party." KRE 404(b)(2).

In determining whether to admit evidence of other crimes, wrongs, or acts under KRE 404(b), a trial court must consider the three factors of relevance, probativeness, and prejudice as set forth in *Bell v. Commonwealth*, 875 S.W.2d 882 (Ky. 1994). That is, the trial court must consider 1) whether the proffered evidence is relevant for some purpose other than to prove the defendant's criminal disposition, 2) whether evidence of the other crime, wrong, or act is sufficiently probative of its commission by the defendant, and 3) whether the potential prejudice from admission of the proffered evidence substantially outweighs its probative value. *Bell*, 875 S.W.2d at 889-91. In considering these factors, the trial court "must apply [KRE 404(b)] cautiously, with an eye towards eliminating evidence which is relevant only as proof of an accused's propensity to commit a certain type of crime." *Id.* at 889. We review a trial court's decision to admit evidence under KRE 404(b) for abuse of discretion. *Anderson v. Commonwealth*, 231 S.W.3d 117, 119 (Ky. 2007).

We find no abuse of discretion in the trial court's application of KRE 404(b) here. As to the first *Bell* factor of relevance, the trial court must determine whether admission of the evidence of other crimes, wrongs, or acts would be in furtherance of one of the permissible purposes under KRE 404(b)(1). *Southworth v. Commonwealth*, 435 S.W.3d 32, 49 (Ky. 2014). The

17

trial court must also find that the evidence materially bears on an element of the charged offense or some other fact in dispute. *Jenkins v. Commonwealth*, 496 S.W.3d 435, 457 (Ky. 2016).

The trial court did not err in finding the *Bell* relevance factor satisfied here. We have long held that "threats against the victim of a crime are probative of the defendant's motive and intent to commit the crime." *Sherroan v. Commonwealth*, 142 S.W.3d 7, 18 (Ky. 2004). Likewise, "'evidence of similar acts perpetrated against the same victim are almost always admissible'" under KRE 404(b). *Harp v. Commonwealth*, 266 S.W.3d 813, 822 (Ky. 2008) (quoting *Noel v. Commonwealth*, 76 S.W.3d 923, 931 (Ky. 2002)).

Such was the case here. The July and August 2018 and January 2019 domestic violence incidents, recordings, and subsequent related convictions were unquestionably relevant to the charged offense of attempted murder insofar as they supported the Commonwealth's case that Bunch shot at Gribbins with an intent to kill her. In the July 2018 incident Bunch physically assaulted Gribbins. In August 2018 he again physically assaulted her, this time pushing her into a jacuzzi and causing her to badly bite her tongue. In January 2019 he struck Gribbins and threatened to "blow her f'ing brains out." The next day he was recorded telling her he would "put a bullet through [her] goddamn head personally." This evidence of Bunch's past violence and threats to kill Gribbins was plainly relevant to show his intent to kill her on the day of the shooting. The evidence was also materially related to the disputed issue of Bunch's intent, given his raising of a defense that he intended only to scare

18

rather than kill Gribbins and Marple. Thus, because the evidence served a proper purpose under KRE 404(b) of proving intent and bore directly on a material issue in the case, the trial court did not abuse its discretion in finding the *Bell* factor of relevance satisfied.

The second *Bell* factor requires a trial court to consider whether the evidence is sufficiently probative of the defendant's commission of the other alleged crimes, wrongs, and acts, *i.e.* whether "the jury could reasonably conclude that the act[s] occurred and that the defendant was the actor." *Davis v. Commonwealth*, 147 S.W.3d 709, 724-25 (Ky. 2005). Here the evidence included Bunch's criminal convictions after pleading guilty to the conduct at issue. There was thus no question that Bunch engaged in the prior bad acts the Commonwealth sought to introduce.

We also find no abuse of discretion in the trial court's consideration of the third *Bell* factor of prejudice. This factor requires the trial court to ask whether "the tendency of the evidence [is] so strongly to lead the jury into improper character inferences that that tendency 'substantially outweigh[s] [the evidence's] probative value' with regard to its proper uses." *Jenkins*, 496 S.W.3d at 457 (quoting *Bell*, 875 S.W.2d at 890). Here, evidence of the July and August 2018 and January 2019 domestic violence was undoubtedly prejudicial to Bunch, given its depiction of his pattern of repeated death threats and physical violence against Gribbins. However, evidence of that domestic violence was also highly relevant to the issue of Bunch's intent in firing at the victims, particularly given both that it involved the same

19

perpetrator and victim and his adoption of a defense that he intended only to scare rather than harm or kill Gribbins and Marple.

Nor were the incidents so temporally remote that their prejudicial effect substantially outweighed their probative value. *See Woodlee v. Commonwealth*, 306 S.W.3d 461, 465 (Ky. 2010) (noting that temporal remoteness "is a factor to be considered 'when balancing the probative value of [the bad act evidence] and the undue prejudice it caused.'") (quoting *Clark v. Commonwealth*, 223 S.W.3d 90, 100 (Ky. 2007)). The incidents occurred over a period of six to seven months beginning little more than a year before the crime at issue. We cannot find under the facts of this case that the introduction of evidence of such recent death threats and physical violence resulted in undue prejudice to Bunch. In sum, while the prior bad acts evidence was undoubtedly prejudicial to Bunch, the trial court did not abuse its discretion in concluding the resulting prejudice did not substantially outweigh the significant probative value of these acts of domestic violence.

Finally, Bunch contends that at a minimum the recordings of the January 2019 incidents should have been excluded. More particularly, Bunch argues the recordings are difficult to hear and there is a lack of trustworthiness in Gribbins' testimony that Bunch said he would "blow [her] f'ing brains out" during one of the recorded incidents.

A trial court has broad discretion in determining whether a recording is of sufficient quality to permit its admission as evidence. *Gordon v. Commonwealth*, 916 S.W.2d 176, 180 (Ky. 1995). We have reviewed both

20

recordings and find no abuse of discretion in the trial court's conclusion they were of sufficient quality to permit admission.

Nor do we find Gribbins' testimony in conjunction with the playing of one of the recordings improper. A witness may provide narrative testimony in conjunction with the playing of a recording, but such testimony may not become interpretive. *Id.* ("It is for the jury to determine as best it can what is revealed in the tape recording without embellishment or interpretation by a witness."). Thus, a witness may not testify (and a proffered transcript may not indicate) that the recording reveals statements not otherwise intelligible from the recording itself. *Taylor v. Commonwealth*, 611 S.W.3d 730, 744 (Ky. 2020). Otherwise a party's proffered interpretation of inaudible or unintelligible portions of the recording would give that party "an unfair advantage in swaying the jury in favor of one interpretation" of the recording. *Id.* Rather, the witness or transcript should acknowledge that the portion is simply inaudible or unintelligible. *See Norton v. Commonwealth*, 890 S.W.2d 632, 637 (Ky. App. 1994). And of course, "[a]s with any participant in a conversation, [the] . . . witness [is] entitled to testify as to his *recollection* of what was said." *Gordon*, 916 S.W.2d at 180 (emphasis added).

Here, Gribbins did just that. When the recording of the January 2019 incident concluded, the prosecutor asked Gribbins if she was assaulted and what happened. Gribbins responded "he hit me, and then he went in the other room and he got a gun. *And it's muffled.* He told me he'd blow my f'ing brains out." Gribbins did not purport to inform the jury the *recording* revealed Bunch

21

making such a statement.  To the contrary, she acknowledged the recording was difficult to hear and then proceeded to testify as to what she heard Bunch say at the time the recording was made.  This was entirely permissible evidence of Gribbins' recollection of Bunch's statement based upon her participation in the conversation.  There was no error in the admission of that testimony.

### C. The accidental admission of additional prior bad acts by Bunch does not mandate reversal.

Gribbins also testified to additional prior bad acts by Bunch that were beyond the scope of the trial court's ruling regarding evidence admissible under KRE 404(b).  First, Gribbins testified that Bunch was explosive and violent, that he stalked her and she felt the need to protect her family from him, and that she had sex with him out of a fear of violent repercussions for refusing to do so.  Bunch acknowledges that he did not object at trial to the admission of these statements and therefore requests palpable error review.  RCr[6] 10.26.

Under RCr 10.26, "[a] palpable error which affects the substantial rights of a party may be considered . . . by an appellate court on appeal, even though insufficiently raised or preserved for review, and appropriate relief may be granted upon a determination that manifest injustice has resulted from the error."  In determining whether an error is palpable, we consider

> "whether on the whole case there is a substantial possibility that the result would have been any different."  To be palpable, an error must be "easily perceptible, plain, obvious and readily noticeable."  A palpable error must be so grave that, if uncorrected, it would seriously affect the fairness of the proceedings.  "It should be so egregious that it jumps off the page . . . and cries out for relief."

---

[6] Rule of Criminal Procedure.

*Davis v. Commonwealth*, 620 S.W.3d 16, 30 (Ky. 2021) (citations omitted). Even where an error is palpable, relief is warranted only where it results in manifest injustice. *Commonwealth v. Caudill*, 540 S.W.3d 364, 367 (Ky. 2018). An error results in manifest injustice if it "so seriously affected the fairness, integrity, or public reputation of the proceeding as to be 'shocking or jurisprudentially intolerable.'" *Conrad v. Commonwealth*, 534 S.W.3d 779, 783 (Ky. 2017) (quoting *Martin v. Commonwealth*, 207 S.W.3d 1, 4 (Ky. 2006)).

We do not find that Gribbins' testimony seriously affected the fairness of the trial or that without such testimony there is a substantial possibility the result would have been any different. Her descriptions of Bunch's explosive, violent, threatening, and controlling behaviors were merely cumulative. Those traits were evident from the July and August 2018 and January 2019 incidents, recordings, and convictions. Gribbins' testimony added nothing the jury could not already glean from the duly admitted KRE 404(b) evidence. We therefore find no palpable error or manifest injustice in the accidental admission of these additional prior bad acts.

Bunch also contends reversible error occurred when Gribbins testified he became angry with her for overfilling a cat food bowl, took her van and gave it to his parents, and accused her of having sex with numerous men including her brothers. This testimony exceeded the scope of evidence found admissible by the trial court under KRE 404(b) and Bunch immediately objected. However, he failed to request an admonition to the jury to disregard the testimony.

23

"The cure for accidental admission of prior bad acts is an admonition to the jury to disregard the testimony." *Boyd v. Commonwealth*, 439 S.W.3d 126, 132 (Ky. 2014). "When an admonition is sufficient to cure an error and the defendant fails to ask for one, we will not review the error." *Id.* at 133. An admonition is sufficient unless either 1) there is overwhelming probability that the jury is incapable of following the admonition *and* a strong likelihood the impermissible evidence would be devastating to the defendant, or 2) the testimony was made in response to a question that was both not premised on a factual basis *and* inflammatory or highly prejudicial. *Sherroan*, 142 S.W.3d at 17.

Here, Gribbins' testimony regarding these additional incidents was brief and there is no basis to conclude the jury could not have followed an admonition to disregard it. Though certainly not flattering, the evidence also was not devastating to Bunch given the other properly admitted evidence of his pattern of domestic violence. The testimony was responsive to very general questions that were not inflammatory, prejudicial, or lacking in factual basis, including "tell me about your relationship," "tell me about your van," and "what began to happen [later in the relationship]?" An admonition thus would have been sufficient to cure the error. As we have noted, a mistrial should be granted only "when the error 'is of such magnitude that a litigant would be denied a fair and impartial trial and the prejudicial effect could be removed in no other way.'" *Brown v. Commonwealth*, 416 S.W.3d 302, 312 (Ky. 2013) (quoting *Matthews v. Commonwealth*, 163 S.W.3d 11, 17 (Ky.

24

2005)). Moreover, a mistrial is "'an extreme remedy and should be resorted to only when there is a fundamental defect in the proceedings and there is a 'manifest necessity for such an action.'" *Id.* (quoting *Woodward v. Commonwealth*, 147 S.W.3d 63, 68 (Ky. 2004)). Thus, because an admonition would have cured the error and because the testimony in any event was brief and not devastating given the other properly admitted evidence of Bunch's pattern of domestic violence, we find no abuse of discretion in the trial court's denial of the motion for mistrial.

### III. Bunch was not entitled to lesser-included offense instructions for wanton endangerment in the second degree or attempted first-degree assault under EED.

Finally, Bunch argues the trial court erred in refusing to give the jury lesser-included offense instructions on second-degree wanton endangerment and attempted first-degree assault under EED. A trial court should instruct on a lesser-included offense if, and only if, under the evidence presented a reasonable juror could have reasonable doubt as to the defendant's guilt for the greater charge but find beyond a reasonable doubt that the defendant is guilty of the lesser charge. *Allen v. Commonwealth*, 338 S.W.3d 252, 255 (Ky. 2011). On appeal, we review allegations that a trial court erred in refusing a requested jury instruction for abuse of discretion. *Caudill*, 540 S.W.3d at 367. In so doing, we construe the evidence in favor of the proponent of the instruction and ask "whether a reasonable juror could acquit of the greater charge but convict of the lesser." *Allen*, 338 S.W.3d at 255.

Bunch contends he was entitled to a second-degree wanton endangerment instruction as to Gribbins and Marple given his statements that he intended only to scare rather than kill them and because he was a good shot. First-degree wanton endangerment differs from second-degree wanton endangerment in

> the mental state and degree of danger created. As to the mental state, both crimes require wanton behavior, but first-degree also requires "circumstances manifesting extreme indifference to the value of human life," which has been described as "aggravated wantonness." As to the danger created, first-degree requires a substantial danger of death or serious physical injury, whereas second-degree requires only a substantial danger of physical injury.

*Swan*, 384 S.W.3d at 102 (citation omitted). The evidence at trial was that Bunch fired shots directly through the doorway where Gribbins and Marple had just been standing as they ran back into the home. At least one shot flew between Gribbins and Marple and Gribbins was struck by exploding glass. Even crediting evidence that Bunch was a "good shot," no reasonable juror could have reasonable doubt that in firing directly at the victims and nearly hitting them, Bunch manifested extreme indifference to the value of human life or that his conduct created a substantial danger of death or serious physical injury rather than mere physical injury. *See Combs v. Commonwealth*, 652 S.W.2d 859, 860-61 (Ky. 1983) (holding that trial court properly refused to instruct on second-degree wanton endangerment where defendant fired at and in the immediate vicinity of victims). The trial court therefore did not abuse its discretion in refusing Bunch's request for lesser-included offense instructions on second-degree wanton endangerment as to Gribbins and Marple.

26

Bunch contends he was also entitled to a second-degree wanton endangerment instruction as to Veda given both his statements that he did not know she was in the home at the time of the shooting and her distance from his firing of the shots. We disagree.

First, Bunch's alleged lack of awareness that Veda was in the home is immaterial because liability for his knowingly wanton creation of danger to Gribbins and Marple transfers as a matter of law to his creation of danger to Veda, whether he was aware of the risk to her or not.[7] KRS 501.060 provides that "[w]hen wantonly . . . causing a particular result is an element of an offense, the element is not established if the actual result is not within the risk of which the actor is aware . . . *unless* [t]he actual result differs from the probable result only in the respect that a different person [is] affected." KRS 501.060(3)(a) (emphasis added). Thus, in the context of wanton endangerment, if a defendant engages in wanton conduct creating a substantial danger of injury to persons he is aware will face such risk, he may also be held liable for the same resulting danger to other persons he does not know he has placed at risk. *Id.*; KRS 508.060-070; *see also* Leslie W. Abramson, 10 Kentucky Practice, *Substantive Criminal Law*, § 2:25 (3d ed. 2010) ("Where the actual result involves harm [or danger] to a different person or different property than was risked, and the defendant was aware of the risk, his wanton conduct is

---

[7] In considering the propriety of lesser-included offense instructions, we construe the evidence in favor of Bunch as the proponent of those instructions. *Allen*, 338 S.W.3d at 255. We therefore accept for purposes of this analysis his statement to Deputy White that he was unaware Veda was in the home, despite the fact she may have been on the front porch when he drove by the home shortly before the shooting.

27

regarded as the cause of the result."). As such, because Bunch knowingly engaged in conduct creating a substantial danger of death or serious physical injury to Gribbins and Marple, he also may be held liable for the resulting risk to Veda even if he did not know she was in the home.

Second, no reasonable juror could have found that in shooting blindly into the home, Bunch did not manifest extreme indifference to human life. Nor could a juror have reasonable doubt that in shooting into the upstairs window on the same floor as Veda, Bunch created a substantial danger of death or serious physical injury to her. We recently noted that in cases involving shootings, there are "many variables affecting the risk that a bystander will be seriously injured, including movement of the target, distraction of the shooter, and environmental elements such as wind." *Hall v. Commonwealth*, 645 S.W.3d 383, 394 (Ky. 2022). We also acknowledged that while the skill of the shooter may be relevant, other factors may outweigh that consideration. *Id.* Here, Veda was an eight-year-old child separated from her father in a different part of the home when shooting broke out. Such circumstances presented a significant risk that Veda would run to find her father. Bunch blindly shot into the level of the home where Veda was located and through which she might have run. He thus also created a substantial danger that Veda would run directly into the line of gunfire. Had she been shot, it is highly likely her injuries would have been serious or fatal. Given these facts, no reasonable juror could have had reasonable doubt that Bunch created a substantial danger of death or serious physical injury to Veda. As such, the trial court did

28

not abuse its discretion in refusing Bunch's request for a lesser-included offense instruction on second-degree wanton endangerment as to Veda.

Bunch also argues the trial court erred in refusing his request for a lesser-included offense instruction on attempted first-degree assault under EED. Bunch asserts the attempted first-degree manslaughter instruction encompassed only the theory that he intended to kill under EED, and that an attempted first-degree assault instruction would have allowed for a finding that he intended only to harm. Under the facts of this case, the jury could have found Bunch guilty of attempted first-degree assault under EED only if it found 1) he intended to cause serious physical injury by means of a deadly weapon or dangerous instrument, 2) he intentionally took a substantial step in a course of conduct planned to culminate in that result, and 3) he did so under the influence of extreme emotional disturbance. KRS 508.010; KRS 506.010; KRS 508.040. However, there was no evidence at trial to support a finding that Bunch intended to cause serious physical injury. Bunch shot directly at Gribbins and Marple multiple times with a gun, with at least one bullet flying directly between them as they ran in fear. The Commonwealth presented previous threats by Bunch to kill Gribbins. Bunch defended by arguing he only meant to scare Gribbins and Marple, pointing to his repeated statements to that effect during his statement to Deputy White. However there was no proof that in shooting directly at his victims, Bunch had an intention to seriously injure but not kill them. Thus, because a jury could not have found the required element of an intention to cause serious physical injury as

29

required for a conviction of attempted first-degree assault, the trial court properly denied Bunch's request for such an instruction.

## CONCLUSION

For the foregoing reasons, we affirm the judgment and sentence of the Washington Circuit Court.

All sitting. All concur. Conley, J., also concurs by separate opinion in which Thompson, J., joins.

CONLEY, J., CONCURRING: I fully concur with the Court's conclusion. I write separately to briefly address any seeming contradiction between my affirming the denial of the second-degree wanton endangerment instruction in this case, and the reversal of the trial court on that very same issue in *Dwight Taylor v. Commonwealth*, 2021-SC-0483, also rendered today.

Kentucky law has held that firing a weapon wantonly in the immediate vicinity of a person is an act that "manifested an extreme indifference to the value of human life and, likewise, a reasonable juror could not doubt that his conduct created a substantial danger of death or serious physical injury to another person." *Combs v. Commonwealth*, 652 S.W.2d 859, 861 (Ky. 1983). Similarly, we have held firing a gun into a closed door with a person behind it merited a first-degree wanton endangerment instruction. *Paulley v. Commonwealth*, 323 S.W.3d 715, 724 (Ky. 2010). And in like manner, firing blindly into a residential home was also held to warrant a first-degree wanton endangerment charge for every person in the homes at the time of the shooting. *West v. Commonwealth*, 161 S.W.3d 331, 336-37 (Ky. App. 2004). Finally, we

30

have stated that wantonly firing a weapon in the immediate vicinity of a person or blindly into a house are "quintessential examples of first-degree wanton endangerment." *Swan v. Commonwealth*, 384 S.W.3d 77, 103 (Ky. 2012). Therefore, I agree with the Court's analysis that Bunch's actions did not merit a second-degree wanton endangerment instruction.

Thompson, J., joins.

COUNSEL FOR APPELLANT:

Emily Holt Rhorer
Assistant Public Advocate

COUNSEL FOR APPELLEE:

Daniel Cameron
Attorney General of Kentucky

Courtney J. Hightower
Assistant Attorney General